{¶ 65} I must respectfully dissent inasmuch as there is insufficient evidence to establish juror misconduct and insufficient evidence to establish that the plaintiff was denied a right to an impartial jury. *Page 18 
 {¶ 66} While the majority correctly rests its decision on the United States Supreme Court holding in McDonough Power Equip., Inc. v.Greenwood (1984), 464 U.S. 548, they fail to consider the true import of those Ohio cases decided subsequent to McDonough that hold that theburden of proof is on the complaining party to show that the juror gave a dishonest answer and that the answer would have provided a valid basis for a challenge for cause. Dedmon v. Mack, 6th Dist. No. L-05-1108,2006-Ohio-2113, at ¶ 20. (Emphasis added.)
 {¶ 67} In the instant case, there is no evidence in the record to establish that Juror Krusely gave a dishonest answer. During voir dire, appellant's counsel posed the following question to the venire: "How about members of your family? Have you ever taken a member of your family to Trumbull Memorial emergency room?" To which another juror answered, "yes." Appellant's counsel continued by asking, "[a]bout that, any experiences that you think will influence your decision making on this case? * * *" Appellant's counsel immediately followed that question with an explanation of the two different divisions within the emergency department and an explanation of the process of hospitals subletting the emergency department to an outside group. This discussion led the juror who had initially responded affirmatively to the original question posed to shift the discussion to billing practices of emergency departments. Then appellant's counsel posed three new questions at once: "Do you believe it is reasonable to expect that Emergency Professional Services, Inc., if they are going to sublet the emergency room in our community hospital, would hire qualified doctors to handle the emergency room? You think that is a reasonable expectation? What do you expect from an *Page 19 
emergency room doctor? Anthony [Juror Krusely], what do you expect?" This colloquy followed as Juror Krusely answered the question posed directly to him.
 {¶ 68} A: "I don't like the idea of it being a primary care * * * I think the emergency room has an obligation to save your life, to not make it any worse, to not necessarily cure you, but at least get you on the road to where maybe I need to send you to a professional tomorrow. I'll make an appointment with a bone specialist or whatever you happen to need."
 {¶ 69} Q: "Sort of, what is going on?"
 {¶ 70} A: "Yes."
 {¶ 71} Q: "And not necessarily cure you, but at least identify what the problem is?"
 {¶ 72} A: "Certainly. I don't think everything can be cured in the emergency room setting."
 {¶ 73} Q: "I agree, is that a reasonable expectation?"
 {¶ 74} A: "Yes."
 {¶ 75} Q: "Anybody else? Yes, sir?"
 {¶ 76} And with that question appellant's attorney moved on to another juror.
 {¶ 77} Later in voir dire, appellant's attorney returned to Mr. Krusely and asked, "Have you heard anything so far that makes you feel that you couldn't be fair?" To which Mr. Krusely replied, "No."
 {¶ 78} After a question about Mr. Krusely's military time in Germany and his prior jury experience, this question was posed to Mr. Krusely. "Do you think you can be fair *Page 20 
to both sides and decide the case on the evidence?" To which he answered, "Yes, absolutely."
 {¶ 79} Mr. Krusely was not under a duty to volunteer information. SeeSwayze v. Scher (Jan. 18, 1995), 2d Dist. No. 14310, 1995 Ohio App. LEXIS 97, at 19-20. Indeed, the question regarding family experience with the Trumbull Memorial emergency room was posed as a general question to the venire. Another prospective juror answered the question first, but instead of posing the same question to the other potential jurors, appellant's counsel chose to move the discussion to another area and chose another question to pose directly to Mr. Krusely.
 {¶ 80} In Dedmon, the appellant alleged that there was juror misconduct because a juror failed to disclose that she was a patient of the defendant clinic. The court found no misconduct because the juror "answered all the voir dire questions asked of her accurately and honestly." Dedmon at ¶ 21. The record before us demonstrates that Mr. Krusely answered accurately and honestly the direct questions that were posed to him. The majority finds misconduct in the fact that Mr. Krusely failed to disclose his son's experience in the Trumbull Memorial emergency room, but that question was not directly posed to him, and in fact, as Mr. Krusely testified at the hearing on the motion for new trial, it was only after he had heard all of the evidence presented during a two and one-half week trial that he recalled the incident.
 {¶ 81} The line of voir dire questioning clearly had moved from the experience of any family members in the Trumbull Memorial emergency room to the question of expectations of an emergency room. Mr. Krusely answered those questions fully and candidly giving his opinion as to his expectations of an emergency room doctor. Then *Page 21 
at the close of voir dire, when asked whether he could be fair to both sides and decide the case on the evidence, (the "bullet" question that must be asked when challenging a potential juror for cause), Mr. Krusely said that he could.
 {¶ 82} In State v. Hughes, 7th Dist. No. 02 CA 15, 2003-Ohio-6094, the defendant argued that he was entitled to a new trial because a juror had failed to inform the court that he had been convicted of a felony. The court held that "where, as here a claim of jury misconduct involves a juror's concealment of information, the defendant must demonstrate that the jury member was not impartial. * * * A court may infer bias if itfinds deliberate concealment, however, if the concealment wasunintentional, the defendant must show that the juror was actuallybiased." Id. at ¶ 11. (Emphasis added.)
 {¶ 83} The court in Zerka v. Green (6th Cir. 1995), 49 F.3d 1181,1186, fn. 7, reiterated the fact that "[i]n the absence of intentionalconcealment, only extreme circumstances justify a new trial." (Emphasis added.) The Sixth Circuit looked to Justice Blackmun's concurring opinion in McDonough, in which he stressed that although it is "possible to find juror partiality regardless of whether a juror answers questions honestly or dishonestly, absent actual bias, a new trial should be ordered "in exceptional circumstances, * * * [where] bias is to be inferred." Id.
 {¶ 84} There is no evidence in the record that Mr. Krusely intentionally concealed any information from which one may infer bias, nor had appellant met his burden of proof as to actual bias.
 {¶ 85} The majority declares that an impartial jury was not seated in this matter, arriving at this conclusion based upon testimony as to Mr. Krusely's opinions voiced after he had heard the evidence andafter he had deliberated with his fellow jurors and *Page 22 
reached a verdict. There is no evidence before this court as to the opinion held by Mr. Krusely at the time of voir dire or prior to instruction and deliberation, and it is at each of these points in time that we must evaluate any partiality or bias via á vis the failure to disclose information. (Emphasis added.)
 {¶ 86} When Mr. Krusely was placed under oath and examined during the hearing on the motion for new trial, the trial court first asked, "what the attorneys are trying to determine is whether or not looking back through this whole series that you would have discussed that incident with your son, if asked or when asked, on the voir dire." Mr. Krusely responded, "Do I remember everything I have ever done? No, sir. But I certainly * * * did not try to hide anything, and I certainly answered everything honestly. Quite frankly, I believe in two and a half weeks of hearing about this case and this 22 year old girl, made me remember about my son who happens to be 22 years old. Had I been reminded of it earlier, I would have certainly relayed that incident."
 {¶ 87} The trial court then asked whether his opinion that Trumbull Memorial emergency room has a "low standard of care" (which he related to appellant's counsel on the courthouse steps after hearing the evidence, after the verdict was announced, and after the jury was discharged) colored his acceptance of the jury instructions that "there is a standard of care, and that it had to be applied to Trumbull, the same [as] it would to Cleveland Clinic or anywhere else." Mr. Krusely replied, "It did not color my opinion or my ability to follow yourinstructions at all." (Emphasis added.)
 {¶ 88} Assuming, arguendo, that Mr. Krusely had held and voiced this "low standard of care" opinion on voir dire, the challenge for cause and the peremptory challenge would have been exercised by the defense, not the plaintiff. *Page 23 
 {¶ 89} The law does not require that every juror be free of bias. The law does require that a juror be able to put aside that bias in order to listen to the evidence presented by both sides and in order to follow the instructions of law and decide the case on the law and the evidence presented.
 {¶ 90} Mr. Krusely was questioned on the courthouse steps, and he recalled the experience with his son at the same emergency room and voiced his opinions after he had heard the evidence. There is no evidence in the record to demonstrate that he recalled the incident with his son during voir dire and deliberately withheld the information when directly asked (which he was not) or that he had formed opinions which could not be put aside prior to hearing the evidence and deliberating with his fellow jurors from which one may infer that he was not impartial. (Emphasis added.)
 {¶ 91} Ultimately, as the majority correctly notes, the decision to deny appellant's motion for new trial premised upon juror misconduct must be reviewed under an abuse of discretion standard. As the Supreme Court of Ohio recognized in Pearson v. Gardner Cartage Co. (1947), 148 Ohio St. 425, "* * * the real question for a reviewing court is whether substantial justice has been done. Whether substantial justice has been done in a cause such as we have before us is a question in the first instance for the trial court in passing upon a motion for a new trial. In other words, the answer rests in the sound discretion of the trial court and where the record discloses no abuse of such discretion, the decision of the trial court should be upheld." Id. at 449.
 {¶ 92} The opinions concerning the hospital and the doctor were revealed after trial, and there is no evidence that these opinions exhibited the quantity and quality of bias that would have provided a basis for a challenge for cause. The trial judge in this *Page 24 
case was in the best position to evaluate this juror as he was able to observe him throughout all phases of the trial and during examination in the hearing on the motion for new trial.
 {¶ 93} Appellant has not demonstrated that the trial court's decision was unreasonable, unconscionable, or arbitrary. "An abuse of discretion is more than an error in judgment or law; it implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable." State v. Sebring, 11th Dist. No. 2006-L-211,2007-Ohio-1637, at ¶ 10, citing Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. "Further, when applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court." Id. citing Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621.
 {¶ 94} Finally, I fear that the majority's opinion opens a door which was closed by the Supreme Court of Ohio in its decision inPearson and its progeny and by the adoption of the "Aliunde" rule. The court in Pearson found the explanation of the trial judge persuasive, and the reasoning is still valid today.
 {¶ 95} The trial judge in Pearson wrote: "When jurors are being impaneled in a case many of them are enjoying that experience for the first time and they are not as collected and calm sitting in the jury box as they might be under different conditions, and it would be hard for anyone to conceive that these jurors deliberately fail to remember and disclose these accidents. The ultimate question is whether the parties to the lawsuit have been in any way prejudiced by the failure of jurors to recall accidents * * *." Pearson at 446-447. *Page 25 
 {¶ 96} The insidious practice of accosting jurors after an adverse verdict with the goal of finding anything with which to impeach the verdict was directly addressed by the trial judge in Pearson, as he wrote:
 {¶ 97} "It has become a new form of indoor sport for plaintiffs, and, or, defendants after the rendering of an adverse verdict to them to start on a quiet search in an effort to discover some failure upon the part of one or more of the jurors to disclose a prior accident which has grown very hazy in their memory.
 {¶ 98} "It has reached the point where jurors are hauled in before a notary public and forced to testify, or where immediately following the verdict one or more of the jurors will be interrogated by counsel even before their service in the court is ended. I have been called at my home by a number of jurors who have asked me whether or not it is necessary for them to talk to counsel following the rendition of their verdict.
 {¶ 99} "Jurors are summoned to this court to perform one of the most important but somewhat burdensome duties of their citizenship. The vast majority of jurors come to this court in good faith, perform their jury duty fairly and conscientiously, and when their term of service is over, unless they have been guilty of something more than forgetting they fell out of a tree when they were twelve years old, or had a fender on their car scraped years before, they should be left alone and not be harassed and subjected to embarrassment and annoyance. I can testify that by reason of the several calls I have had from jurors that it is doing the jury system much harm by these practices. Somewhere the practice should be stopped and jurors, many of whom make sacrifices to serve as jurors, should be let alone." Id. at 447. *Page 26 
 {¶ 100} The reasons for restricting the right to new trials under these circumstances are arguably the same as the reasons given for the Aliunde rule. The Aliunde rule "is intended to preserve the integrity of the jury process and the privacy of deliberations, to protect the finality of the verdict, and to insulate jurors from harassment by dissatisfied or defeated parties, by prohibiting a court from questioning a juror about what occurred during deliberations, or about anything else that may have affected the juror's mind or emotions in the deliberations process once a final verdict is rendered." Hughes
at ¶ 22, citing State v. Scheibel (1990), 55 Ohio St.3d 71, 75.
 {¶ 101} The Aliunde rule "is vital not only to protect jurors from harassment by defeated parties, but to ensure finality of verdicts and preserve the `sanctity of the jury room and the deliberations therein.'"Wittman v. Akron, 9th Dist. No. C.A. 21375, 2003-Ohio-5617, at ¶ 10, citing State v. Hessler (2000), 90 Ohio St.3d 108, 123.
 {¶ 102} As stated by one commentator: "a generous standard for new trials would lead to frequent evidentiary hearings to probe juror responses, with several disadvantageous consequences. First, because controversies over responses such as those in McDonough are common, one could expect them to occupy efforts of judges that otherwise would be used to try more jury trials, and this preemption of court effort would occur in cases in which the outcome is unlikely to change. Second, and perhaps more importantly, it is undesirable to discourage jury service by routinely putting jurors through procedures that require them to defend against accusations of misconduct." Crump, Peremptory Challenges after McDonough Power Equipment, Inc. v. Greenwood: A Problem of Fairness, Finality and Falsehood (1990), 69 Or. L.Rev. 741, 770. *Page 27 
 {¶ 103} Appellant's counsel's discussion was a chance meeting on the courthouse steps, and there was nothing improper about the discussion with Mr. Krusely. But, with so much information readily available on the internet, one can envision a new cottage industry developing and marketed as a method of mining for juror data that could be used to impeach a verdict. Jurors would be interviewed, deposed, and harassed in the hope of getting them to say something that would form the basis for a new trial. Those litigants with ample resources would be at a distinct advantage in the quest for information that could possibly afford them a new trial.
 {¶ 104} Moreover, studies have documented that "* * * perceived insensitivity to the privacy concerns of prospective jurors is one cause of dissatisfaction with jury service." See Hannaford, Making the Case for Juror Privacy: A New Framework for Court Policies and Procedures, State Justice Institute. Because of these privacy concerns, some citizens refuse to register to vote, ignore a jury summons, or fail to fully answer questions posed to them on voir dire.
 {¶ 105} The American jury system is a fundamental component of our democracy. Alexis De Tocqueville in Democracy in America observed that "[t]he jury is that portion of the nation to which the execution of the laws is entrusted, as the legislature is that part of the nation which makes the laws." It is incumbent upon the courts to protect jurors so that our courtrooms remain open and our jury boxes full. *Page 1